# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL CLINTON, <br><br> Plaintiff, <br><br> vs. <br><br> JO ANNE B. BARNHART, <br> Commissioner of Social Security, <br><br> Defendant. | No. C04-2084 <br><br> **ORDER** |

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On July 29, 2005, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 (docket number 15). The decision of the Administrative Law Judge (ALJ) is reversed and this matter is remanded for an award of benefits.

## I.  PROCEDURAL BACKGROUND

Plaintiff Michael Clinton applied for Title II Social Security benefits and Title XVI supplemental security income benefits on October 6, 2000, alleging an inability to work since July 1, 2000, due to recurrent pain. Mr. Clinton's application was originally denied on May 1, 2001. It was denied on reconsideration on September 4, 2001. A hearing before Administrative Law Judge (ALJ) John P. Johnson was held on August 22, 2002. The ALJ denied Mr. Clinton's appeal in a decision dated February 20, 2003. The Appeals Council denied Mr. Clinton's request for review on September 17, 2004. This action for judicial review was filed on November 29, 2004.

1

## II. FACTUAL BACKGROUND

Mr. Clinton was born on February 6, 1955. He attended high school through the ninth grade, obtained his GED, and completed two years of college while in the Marine Corps. (Tr. 14, 43). Mr. Clinton is claiming that a combination of physical and mental impairments resulting from non-Hodgkin's lymphoma, which is now in remission, have rendered him completely unable to work since July 1, 2000. His relevant medical history is set forth below.

In August 1991, Mr. Clinton fell while working construction. (Tr. 263). The fall resulted in back pain, which Mr. Clinton sought treatment for in September 1991. (Tr. 263). Mr. Clinton was diagnosed with a compression fracture of the L1 vertebral body. (Tr. 263). A bone scan performed on September 13, 1991, was normal, but an October 17, 1991, MRI revealed an abnormal signal at the T12 level. (Tr. 263). On November 5, 1991, a biopsy of the T12 vertebra was performed on Mr. Clinton that resulted in a diagnosis of large cell lymphoma, or non-Hodgkin's lymphoma. (Tr. 262, 263). Mr. Clinton received radiation and chemotherapy treatment. (Tr. 269). Dr. Dean H. Gesme pronounced Mr. Clinton "recovered" on July 28, 1992, but stated that Mr. Clinton continued to suffer from chronic back pain and narcotic dependence. (Tr. 269). Throughout this period, Mr. Clinton was taking MS Contin for pain. (Tr. 269). Mr. Clinton underwent back surgery in November 1992 to alleviate his back pain. (Tr. 272–73).

Dr. Gesme noted Mr. Clinton's narcotic habituation on December 2, 1992, and January 4, 1993, and stated that Mr. Clinton needed to decrease his narcotic intake. (Tr. 277–78). Mr. Clinton's medical records show that by November 1993, he had considerably decreased his narcotic intake and was taking Methadone only once or twice per day. (Tr. 281). Mr. Clinton's Methadone use continued until approximately 1997,

during which time his doctors attempted to decrease his reliance on narcotics. (Tr. 281, 282, 284, 286, 288, 290–93, 307). Mr. Clinton also continued to experience back pain. (Tr. 304–05, 308, 310–15).

On January 2, 1997, Mr. Clinton was voluntarily admitted to the Mental Health Institute in Independence, Iowa, for an evaluation following a recent suicide gesture. (Tr. 294). Mr. Clinton was diagnosed with major depression without psychotic features, polysubstance abuse, alcohol abuse, and antisocial personality traits. (Tr. 296). Mr. Clinton was evaluated at the Northeast Iowa Mental Health Center on February 13, 1997, as a follow-up to his January admission to the Mental Health Institute. (Tr. 302). Mr. John Bandstra, a licensed social worker, noted concern for the severity of Mr. Clinton's depression. (Tr. 302).

On August 29, 2000, Mr. Clinton was evaluated by R.K. McCullough, P.A., at Garfield Memorial Hospital & Clinics in Utah. (Tr. 379). Mr. Clinton complained of fatigue with pain that was not relieved by Lortab. (Tr. 379). Mr. McCullough noted that Mr. Clinton was experiencing increasing pain and an elevated white count without a distinct source of infection. (Tr. 379). Mr. McCullough noted the possibility of a return of non-Hodgkin's lymphoma. (Tr. 379).

Mr. Clinton was evaluated by Dr. Gesme on October 10, 2000, upon his return from living in Utah. (Tr. 305). Mr. Clinton complained of fatigue. (Tr. 305). Mr. Clinton's white count was elevated, which Dr. Gesme linked to his fatigue. (Tr. 305). The white count elevation was also attributed, in part, to Mr. Clinton's continued tobacco use. (Tr. 305). Mr. Clinton continued to complain of chronic back pain. (Tr. 305). Mr. Clinton stated that he had worked as a truck driver in Utah and was driving a truck and working construction in Iowa. (Tr. 305). Following the October 10 visit, Dr. Gesme noted on November 17, 2000, that Mr. Clinton had requested to go back on Methadone for his back pain. (Tr. 304). Dr. Gesme stated that he was reluctant to have Mr. Clinton go back on narcotics because of how long it had taken Mr. Clinton to wean himself off of

3

the narcotics before. (Tr. 304). Dr. Gesme suggested Celebrex; Mr. Clinton agreed. (Tr. 304). Dr. Gesme also suggested that Mr. Clinton seek treatment at the Pain Clinic, but Mr. Clinton declined because he said it would be too time consuming. (Tr. 304).

Mr. Clinton's medical records contain a letter from Dr. Fred Pilcher dated December 27, 2000. (Tr. 381). Dr. Pilcher stated that he evaluated Mr. Clinton on December 19, 2000, and found him to suffer from significant back pain and knee and shoulder problems. (Tr. 381). Dr. Pilcher found Mr. Clinton unable to work. (Tr. 381). Dr. Pilcher's notes from the December 19 visit state that Mr. Clinton "could hardly move around the office" due to his pain, all of which Dr. Pilcher found in "the thoracolumbar area where he had the cancer and the surgery." (Tr. 381). Dr. Pilcher also noted that he had not seen Mr. Clinton in "a long time and he [had] been a tough guy with all of these things [prior back difficulties]." (Tr. 381).

Mr. Clinton's medical records contain a letter from Dr. Pilcher to the Disability Determination Service, dated February 20, 2001. (Tr. 391). In the letter, Dr. Pilcher stated that Mr. Clinton is "totally disabled from any type of heavy work or even medium work." (Tr. 391). Dr. Pilcher stated that Mr. Clinton could walk and/or stand, but not for prolonged periods of time, and that "[s]tooping, climbing, kneeling, and crawling would be difficult." (Tr. 391). Dr. Pilcher also stated that "[h]andling, seeing, hearing, speaking and traveling should not be any problem [for Mr. Clinton] other than prolonged sitting." (Tr. 391). Dr. Pilcher felt Mr. Clinton's goal "should be one of retraining in a sedentary type of job." (Tr. 392).

Mr. Clinton was referred to Dr. George M. Harper on March 7, 2001, for a psychological evaluation. (Tr. 387). Dr. Harper noted that Mr. Clinton appeared uncomfortable and frequently repositioned himself, apparently as a result of pain. (Tr. 387). Mr. Clinton displayed signs of anxiety and depression, but no obvious indicators of a thought disorder. (Tr. 387). Dr. Harper stated that Mr. Clinton had been on disability from 1992 to 1998, but had returned to work in 1998 against the advice of

4

his physician. (Tr. 388). Recently, Mr. Clinton had only been able to work part-time. (Tr. 387). Mr. Clinton stated that he awakens at 5 or 6 am on a typical day, watches television and does crossword puzzles in the morning, and runs errands, reads, watches movies, or rests in the afternoon. (Tr. 389). Mr. Clinton does laundry, helps with his childrens' care, and occasionally cooks. (Tr. 389). Dr. Harper noted that Mr. Clinton was rather defensive, guarded, and exhibited signs of a major depressive disorder. (Tr. 389). Dr. Harper also stated that Mr. Clinton complained of anxiety problems and panic attacks within the last year. (Tr. 389). Dr. Harper felt that Mr. Clinton's mental issues might mildly limit his capacity to remember and understand instructions, procedures, and locations. (Tr. 389–90).

Mr. Clinton was examined by Dr. Kyle Christianson on March 13, 2001, at the request of the Disability Determination Service. (Tr. 383). Dr. Christianson noted that Mr. Clinton had some spinal cord compression as a result of his 1992 back surgery. (Tr. 383). Dr. Christianson's evaluation noted that Mr. Clinton stated a subjective lifting limitation of 12 to 15 pounds. (Tr. 383). Mr. Clinton also stated that he could stand for five minutes without moving; walk for six blocks before his back hurt; walk for ten blocks before he had to rest; and cannot stoop, kneel, or crawl. (Tr. 384).

On April 25, 2001, Dr. Stephen C. Elliot performed a functional capacity assessment on Mr. Clinton. (Tr. 398). Dr. Elliot noted that Mr. Clinton could occasionally lift/carry up to 20 pounds, frequently lift/carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. (Tr. 399). Dr. Elliot noted that Mr. Clinton's ability to push and/or pull (including the operation of hand and/or foot controls) was unlimited. (Tr. 399). Dr. Elliot noted that Mr. Clinton could occasionally balance, stoop, kneel, crouch, and crawl, but that he should never climb ladders, rope, or scaffolds. (Tr. 400). No manipulative or environmental limitations were established by Dr. Elliot. (Tr. 401–02). Dr. Elliot stated that Dr. Pilcher's notations from

5

February 20, 2001, were consistent with his observations regarding Mr. Clinton's abilities. (Tr. 404). However, Dr. Elliot expressed concern about Mr. Clinton's credibility in several areas because: "[i]n spite of chronic and constant pain . . . [Mr. Clinton] refused a referral to the Pain Clinic and . . . [he] takes no regular pain medication"; he had continued to drive a truck and work construction until the previous October; and although he stated in his psychological evaluation that he had been fired from his last job the previous October, his employer stated Mr. Clinton was not terminated, but had stopped showing up for work. (Tr. 407).

A functional capacity assessment was performed on Mr. Clinton by Dr. Dee E. Wright on April 6, 2001. Dr. Wright found that Mr. Clinton's understanding and memory, sustained concentration and persistence, social interaction, and adaptation abilities were either moderately limited or not significantly limited. (Tr. 422–23). Dr. Ray Moore affirmed Dr. Wright's determinations on August 24, 2001. (Tr. 422).

Mr. Clinton sought treatment from Dr. Douglas T. Sedlacek on July 11, 2001, for chronic low thoracic, upper lumbar pain. (Tr. 428). Mr. Clinton had previously received an epidural from Dr. Sedlacek on April 23, 2001, for his back pain, but reported little improvement. (Tr. 428). Dr. Sedlacek performed radiofrequency lesioning on Mr. Clinton on July 11 and administered a second epidural on July 12, 2001. (Tr. 428, 440). Mr. Clinton reported that his symptoms were improved on October 4, 2001, and Dr. Sedlacek performed another radiofrequency lesioning procedure at that time. (Tr. 448). A third radiofrequency lesioning procedure was performed on October 25, 2001. (Tr. 444).

Dr. Duane Jasper treated Mr. Clinton on December 10, 2001. (Tr. 457). Dr. Jasper noted Mr. Clinton walked slightly stooped and appeared to be in pain. (Tr. 457). Dr. Jasper prescribed Mr. Clinton Lortab for his pain. (Tr. 457). Dr. Jasper also prescribed Mr. Clinton Lortab on January 4, 25, February 18, March 19, April 16, and May 13, 2002. (Tr. 455–56). Mr. Clinton sought treatment on June 12, 2002, for

6

continued back pain. (Tr. 455). He requested a stronger dose of Lortab, but Dr. Jasper refused. (Tr. 455). Dr. Jasper continued to prescribe Lortab on a monthly basis through November 11, 2002. (Tr. 454–55).

Dr. Pilcher completed a lumbar spine residual functional capacity questionnaire of Mr. Clinton's symptomatology on August 28, 2002. (Tr. 434). Dr. Pilcher noted that Mr. Clinton continued to experience severe pain. (Tr. 435). Dr. Pilcher stated that Mr. Clinton was not a malingerer, his impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation, his pain was severe enough to frequently interfere with his attention and concentration, and that his prognosis was poor. (Tr. 436). Dr. Pilcher stated that Mr. Clinton could sit for no more than 20 minutes at a time, stand for no more than 10 minutes at a time, needed to walk around for five minutes every ten to fifteen minutes, would need unscheduled breaks during an 8-hour work day, and would be absent from work more than four days in a typical month. (Tr. 436–38).

At the hearing before the ALJ on August 22, 2002, Mr. Clinton testified that he was born on February 6, 1955, finished the ninth grade, received his GED, and attended some college while serving in the Marine Corps from 1971 to 1975. (Tr. 40, 43). Mr. Clinton testified that his prior work consisted of driving a truck and working construction. (Tr. 43–44).

Mr. Clinton testified that he received disability benefits as a result of his cancer treatment from 1991 until he returned to work in 1998. (Tr. 46, 50–52). In 1998, Mr. Clinton drove a truck for Crawford Trucking in Lamont, Iowa. (Tr. 47). After a couple of months, Mr. Clinton began driving for Busky Truck Lines in Westfield, Illinois. (Tr. 47). Mr. Clinton testified that although the trucking companies tried to provide him with loads that would not require heavy lifting, those loads were limited in number. (Tr. 47). Mr. Clinton was forced to stop driving after two years because of his ailments. (Tr. 47).

7

After he quit driving for Busky Truck Lines, Mr. Clinton worked for Larson Construction. (Tr. 47). Mr. Clinton testified that he had taken the job expecting to work as a dump truck operator, but had ended up doing labor work. (Tr. 47). Mr. Clinton testified that his condition deteriorated during the two years he returned to work. (Tr. 48). He stated that for every two or three days that he would work, he would need two or three days to recover. (Tr. 53). Mr. Clinton stated at the time of the hearing that he had difficulty walking and required the use of a cane and the help of his family members to get around. (Tr. 49). He also stated that he could only walk a couple of blocks at a time, had problems with concentration as a result of his pain medication, was often depressed, had problems bending or kneeling, could not work with his arms above his head, and could not lift more than 8 or 9 pounds. (Tr. 57–58).

Mr. Clinton testified that at the time of the hearing, he spent a typical day talking to his wife and reading. (Tr. 59). He stated that he was reading Albert Camus's <u>The Stranger</u>, an unnamed work by Voltaire, and <u>Malcolm X</u>. (Tr. 59–60). Mr. Clinton stated that has to lay down twice a day to rest. (Tr. 60).

Mr. Clinton also testified that he drives about 20 miles during a normal week and was going to college through Vocational Rehabilitation. (Tr. 66). Mr. Clinton stated he had worked at a hotel from February to May 2000 as a maintenance employee. (Tr. 68). He stated he primarily did carpentry work and had left in May 2000 because the hotel had closed. (Tr. 69). Mr. Clinton also stated that he had owned his own siding business from 1993 until 1995, while he was collecting disability benefits. (Tr. 69). He stated that his work was supervisory and did not necessitate any labor on his part. (Tr. 70–71).

At the hearing, the ALJ questioned Mr. Clinton about who had prescribed the cane he was using. (Tr. 73). Mr. Clinton stated that Dr. Pilcher had told him that "if it helps me, to use it, go ahead and use it." (Tr. 73). Mr. Clinton never directly stated that Dr. Pilcher had prescribed the cane and Mr. Clinton's medical records do not provide any indication that the cane was prescribed by Dr. Pilcher.

8

Vocational expert Carma A. Mitchell also testified at the August 22, 2002, hearing. (Tr. 80). The ALJ presented a hypothetical claimant to Ms. Mitchell with limitations similar to those experienced by Mr. Clinton. (Tr. 83–84). The ALJ's hypothetical claimant was a 47-year old male with a history of non-Hodgkins lymphoma and the same symptomatology that afflicted Mr. Clinton. (Tr. 83–84). The hypothetical claimant could not lift more than 20 pounds, or routinely lift more than 10 pounds, could not stand for more than 60 minutes, nor walk more than 6 blocks at a time. (Tr. 84). The hypothetical claimant could not do very complex, technical work, but could do more than simple, repetitive, routine work. (Tr. 84). Ms. Mitchell testified that a person with such limitations could not return to any of Mr. Clinton's past relevant work due to the lifting and sitting limitations. (Tr. 85). However, Ms. Mitchell testified that there were other jobs in the national economy a person with such limitations could perform, including positions as a lot attendant, chauffeur, and auto rental car driver.[1] (Tr. 86). Ms. Mitchell also testified that there were numerous unskilled positions someone with such limitations could perform, including positions as an arcade or floor attendant at a recreational facility, a light inserting machine operator, a mail clerk, and other unskilled helper, office helper jobs.[2] (Tr. 87–88).

---

[1] Ms. Mitchell testified that the positions she felt Mr. Clinton could perform were light, low-level, semi-skilled positions. (Tr. 85). Ms. Mitchell testified that there were approximately 100 persons employed as lot attendants in Iowa and approximately 16,000 persons so employed in the United States; 200 persons employed as chauffeurs in Iowa and 120,000 persons so employed in the United States; and 150 persons employed as auto rental car drivers in Iowa and 18,000 persons so employed in the United States. (Tr. 85).

[2] Ms. Mitchell testified that there were approximately 200 persons employed as floor attendants in Iowa and approximately 20,000 persons so employed in the United States; 200 persons employed as light inserting machine operators in Iowa and 20,000 persons so employed in the United States; 690 persons employed as mail clerks in Iowa and 51,500 persons so employed in the United States; and 2,200 persons employed as office helpers in Iowa and 266,000 persons so employed in the United States. (Tr. 87–88).

The ALJ then posed another hypothetical claimant to Ms. Mitchell. (Tr. 88). The second hypothetical claimant suffered from the same limitations as the first hypothetical claimant, but could lift no more than 5 to 10 pounds; stand no more than 10 to 15 minutes, sit no more than 30 minutes, or walk no more than two blocks at a time; only occasionally bend, stoop, squat, but not kneel or crawl; could not do any repetitive pushing or pulling, nor continually use foot controls. (Tr. 88). Ms. Mitchell testified that a person with such limitations could not return to any of Mr. Clinton's past relevant work. (Tr. 89). Ms. Mitchell did state that a person with such limitations could perform other relevant work in the national economy, including work as a charge account clerk, cashier/order clerk, or surveillance monitor.[3] (Tr. 90).

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial

---

[3] Ms. Mitchell testified that there were approximately 770 persons employed as charge account clerks in Iowa and approximately 85,600 persons so employed in the United States; 1,400 persons employed as cashier/order clerks in Iowa and 142,000 persons so employed in the United States; and 200 persons employed as surveillance monitors in Iowa and 33,000 persons so employed in the United States. (Tr. 90).

evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
>
> (1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
> (3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
> (4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.
> (5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

11

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ determined that Mr. Clinton had not engaged in substantial gainful employment since December 2000. (Tr. 22). At the second step, the ALJ determined that Mr. Clinton had the following severe impairments: a history of non-Hodgkins lymphoma at T12, status post radiation, chemotherapy, and surgery; a history of left knee and right shoulder surgery; allegations of a medically determinable impairment with complaints of cramping hands; depressive disorder NOS; and anxiety disorder NOS. (Tr. 22). At the third step, the ALJ determined that Mr. Clinton's impairments were not equivalent to one of the listed impairments. (Tr. 22–23). At the fourth and fifth steps, the ALJ determined that Mr. Clinton was unable to perform his past relevant work (Tr. 23), but was able to make a vocational adjustment to work that exists in significant numbers in the national economy, including call-out operator, charge account clerk, cashier/order clerk, and surveillance system monitor. (Tr. 23). Thus, the ALJ concluded that Mr. Clinton was not "disabled." (Tr. 23).

### C. Opinion of Treating Physician

Mr. Clinton relies heavily upon the opinion of Dr. Pilcher, who stated in a letter dated December 27, 2000, that Mr. Clinton was unable to work. (Tr. 381). Dr. Pilcher also wrote a second letter on February 20, 2001, in which he opined that the goal for Mr. Clinton should be sedentary work. (Tr. 391). Specifically, Dr. Pilcher wrote:

> . . . retraining and physical therapy is not going to be much help. [Mr. Clinton] just basically needs a life change

> retraining. As far as I am concerned, he is totally disabled from any type of heavy work or even medium work. I think all he will be able to do is just sedentary type activities with just walking, standing. None of these could be for prolonged periods of time. Stooping, climbing, kneeling and crawling would be difficult. Handling, seeing, hearing, speaking and traveling should not be any problem other than prolonged sitting. In essence, this man is quite symptomatic from all the areas that is mentioned and his goal should be one of retraining in a sedentary type of job as I have described above.

The ALJ did not give Dr. Pilcher's opinion controlling weight because he had not seen Mr. Clinton on a regular basis during the relevant period and because inconsistencies between Dr. Pilcher's statements and Mr. Clinton's medical records were present.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

As the ALJ correctly pointed out, Mr. Clinton's medical records indicate that he sought treatment from Dr. Pilcher on only two occasions since 2000: December 19, 2000, and June 18, 2002. (Tr. 21, 433). Accordingly, although it is clearly questionable as to whether Dr. Pilcher could be labeled a treating physician, he nevertheless was certainly an examining physician, and because his opinion is not inconsistent with the record as a whole, it should have been accorded more weight than the consultative physicians' opinions upon which the ALJ apparently ultimately relied in determining Mr. Clinton's

13

RFC. Having found that Dr. Pilcher's opinions are not inconsistent with the record as a whole, the question remains as to whether Dr. Pilcher's opinions are themselves inconsistent. In Dr. Pilcher's letter of December 27, 2000, he states that due to Mr. Clinton's "significant back pain as well as knee and shoulder problems," he is "unable to work." However, as set forth more fully above, Dr. Pilcher's February 20, 2001, letter indicates that the goal for Mr. Clinton should be "one of retraining in a sedentary type job," and in keeping with his proffered limitations.[4] The court finds that although Dr. Pilcher's second letter concerning Mr. Clinton's limitations is certainly more specific as to what those limitations are and what kinds of work Mr. Clinton is precluded from, the opinions are not necessarily inconsistent. Accordingly, the ALJ erred in rejecting Dr. Pilcher's opinions.

## D. Improper Hypothetical

Mr. Clinton claims that the hypotheticals presented by the ALJ to Ms. Mitchell were improper because they did not include the limitations given by Dr. Pilcher. Based on the court's finding that the ALJ improperly disregarded Dr. Pilcher's opinion, the court agrees.

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263–64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 668, 694–95 (8th Cir. 1996). The question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ. Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

A remand for further vocational testimony is unnecessary. The vocational expert testified that someone who is limited to sitting for no more than 60 minutes at a time would

---

[4] Again, these limitations include doing "sedentary type activities with just walking, standing," none of which could be done "for prolonged periods of time." Also, "stooping, climbing, kneeling and crawling would be difficult, and handling, seeing, hearing, speaking and traveling should not be any problem other than prolonged sitting."

14

be precluded from performing Mr. Clinton's past relevant work and would further be precluded from other work in the national economy.[5] Accordingly, in considering Dr. Pilcher's limitation that Mr. Clinton not do any prolonged sitting, Mr. Clinton would be precluded from performing his past relevant work as well as other work in the national economy.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is reversed and this matter is remanded for an award of benefits.

February 13, 2006.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[5] See Tr. 84-85. The exchange between the ALJ and the vocational expert in this regard was, in relevant part, as follows:

> Q: [ALJ, Proposing an RFC hypothetical] . . . no sitting of more than 60 minutes at a time . . .
> A: (Vocational Expert) No, I don't feel the individual would be able to return to any of the past work as he did it or as per the national economy, as my understanding of these limitations.
> Q: (ALJ) And what specific limitation or limitations on work activity would preclude performance of past work?
> A: (Vocational Expert) I feel the main limitations would include the lifting limitations and the sitting, some of the sitting limitations . . .